IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 11, 2017

**STATE OF TENNESSEE v. FRED BEAL**

**Appeal from the Criminal Court for Shelby County**
No. 11-07745          Chris Craft, Judge

_____

**No. W2016-00905-CCA-R3-CD**

_____

Defendant, Fred Beal, was convicted by a jury of first degree premeditated murder, felony murder, attempted first degree murder, two counts of attempted especially aggravated robbery, and employing a firearm during the commission of a dangerous felony. He appeals, arguing that the evidence is insufficient to support the convictions. As part of our review of the record, we note that there is no judgment form for Count 1 in the record. On remand, the trial court should enter a judgment form for Count 1, first degree felony murder. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Laurie W. Hall (at trial and on appeal) and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Fred Beal.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Neal Oldham and Colin Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

Amelia Campbell, also known as "Mimi," and Travis Metcalf were shot while hanging out on a Memphis street in July of 2011. Ms. Campbell, the victim, was killed by a gunshot wound to the head. Mr. Metcalf was wounded by a gunshot to the back. Defendant, Brandon Holmes, and Cremario Smith were named in a multi-count indictment by the Shelby County Grand Jury. Defendant and Mr. Holmes, both juveniles[1] at the time of the incident, were charged with first degree murder, felony murder, two counts of attempted especially aggravated robbery, attempted first degree murder, and employing a firearm during the commission of a felony. Mr. Smith was indicted for facilitation of first degree murder and facilitation of attempted first degree murder. At the time of trial, Mr. Holmes was prepared to enter a guilty plea to second degree murder in exchange for a sentence of twenty-seven years. Mr. Smith had not entered into a plea agreement at the time of his testimony at trial.

Estella Beal[2] lived in the area near where the incident took place. That evening, she went to a friend's home on Shasta Street to charge her phone because she did not have electricity. When she left the friend's house, she stopped to talk to the victim, the victim's four-year-old child, and the victim's cousin, Jerrica Reed. The women were "[s]itting right there on the curb" next to a "vacant lot" where there was a "barrel and table to play [d]omino[e]s." Ms. Beal stood and talked to the women for just a short time when she "noticed someone go across the field behind" them. There were two men running, one of whom was tall and slim and the other was short, and both were wearing a "scarf or something tied across their face[s]." Ms. Beal asked the women if they knew who was running behind them. Before they could answer, someone was telling everyone to "get down." Ms. Beal "bent down over the child" and then "heard shots." She estimated that there were four but no more than five shots fired. Ms. Beal was unable to clearly see the shooters but told police on the night of the incident that the taller man fired the first shot. When the shots subsided, Ms. Beal noticed that the victim had fallen "backwards in the chair." Travis Metcalf, who was "getting ready to cross the street as the shooting started," was also hit by a bullet.

Angela Clark, the neighbor of the victim, was also standing on the street talking to victim on the night of the shooting. She recalled that their conversation was about the "kids going back to school and buying uniforms and where was the cheapest place[] to go" when "two guys came from off . . . Dexter Street." One of them had a "T-shirt on their head and the other one had a bandana or something on their head." Because it was hot outside, Ms. Clark "instantly thought that something was wrong" when she noticed the way the men were dressed. She summoned her two-year old, who was playing

---

[1] It is not clear from the record whether this case started in juvenile court and was transferred to adult court.

[2] Ms. Beal is no relation to Defendant.

nearby, when suddenly one of the men "pulled up a pistol" and told everyone to "get down." Ms. Clark only saw one of the men shooting. She described him as "tall and brown skin" while the other man was "short and dark." She did not know who the men were at the time.

Ms. Clark, a certified medical assistant, helped Mr. Metcalf, who had been shot in the buttocks area. She instructed him to stay still and called an ambulance. Ms. Clark checked on the victim, who had been shot in the head. The victim still had a pulse at the time, but her heart stopped beating about twenty seconds later. According to expert testimony, the victim died from a single gunshot wound to the head from a bullet with markings consistent with a .38 caliber. The bullet that killed the victim could not have been fired with a .22 caliber.

Jerrica Reed, the victim's cousin, immediately thought it was a "robbery" and described the scene as follows:

> Well while we was sitting there two guys came from the cut, well from a pathway across the street, and they was walking behind us as if they was going to go through another cut that was behind us, but they didn't. They came behind us. You know, I slightly turned to them and was like what are you guys doing and they said get down, get down. They started shooting.

Ms. Reed described the shooters as two black males, noting that one was tall and one was shorter. She was unable to see their faces because they had "shirts or bandanas or something on their faces." The men were about ten to twelve feet away when they told her to get down. She saw "one gun" and heard "more than four" shots and thought that both of the men were shooting. Ms. Reed saw the victim get shot in the head and Mr. Metcalf lying in the street. Ms. Reed and Ms. Beal both called 911. The men ran away without taking anything from anyone. Officer Lemarcus Webb responded to the shooting call. As part of the investigation, officers recovered a black MP3 player and several small caliber bullet casings from the scene.

Ms. Reed admitted that earlier in the day of the shooting, she had gotten into an argument with a young man named Justin Lewis, who lived nearby. According to Ms. Reed, she was walking on Dexter Street when Mr. Lewis swerved his car toward her body. Ms. Reed cursed at him. Ms. Reed saw Mr. Lewis and his brother, Raydontae[3] Wells, several minutes later but refused to argue with them because they were "little boy[s]." Ms. Reed testified that Mr. Wells later rode a bicycle on Shasta Street and repeatedly called Ms. Reed a "ho." Ms. Reed told police that the shooters were

---

[3] Raydontae Wells is also referred to at trial as "Dontae."

physically shaped like Mr. Lewis and his brother and was able to identify Mr. Lewis in a photographic lineup as the person she argued with prior to the shooting.[4]

Travis Metcalf recalled standing outside when "somebody come behind me asking me to drop it off." He explained that "drop it off" was a "statement [used] when a person intends to rob you." Initially, he thought it was a joke, but when he realized that the "two people with shirts and stuff tied around their mouth" were serious, he put his hands up and started running. He did not make it all the way to the sidewalk before he was shot in the back. Mr. Metcalf admitted that he initially identified Justin Lewis and Raydontae Wells as the perpetrators but was not certain at the time of trial that they were the men who attempted to rob him and eventually shot him.

One of the co-defendants, Brandon Holmes, testified that he and Defendant planned on robbing a man on Shasta Street after hearing that someone had "a whole lot of money" from a refund check. They discussed the robbery while hanging out on Meagher Street on July 19, 2011. At the time, Defendant was already in possession of a .38 special revolver. Mr. Holmes planned to get a .22 caliber pistol from his cousin, Cremario Smith.

That same day, Mr. Smith was driving to his grandmother's house on Houck Street in Memphis with his "baby mama," Laquisha Renee Kelly, and his two-year-old son. Mr. Smith was approached by Mr. Holmes and Defendant about participating in a robbery. Mr. Smith knew Defendant from "the hood." Defendant was in possession of a gun that looked like a "cowboy" gun.[5] Mr. Holmes and Defendant told Mr. Smith they had a "lick," or a potential robbery target. Mr. Smith did not think they were serious at the time. Defendant and Mr. Holmes left on foot. Ms. Kelly overheard the conversation and confirmed that Mr. Holmes and Defendant were talking about a possible robbery.

Several hours later, Mr. Smith drove his car and met up with Mr. Holmes at a church on Meagher Street. Mr. Smith explained that he had been smoking marijuana and did not want to "ride with no gun and smoke weed at the same time," so he gave Mr.

---

[4] Justin Lewis, a convicted drug dealer who was incarcerated at the time of trial, admitted that he and his brother, Mr. Wells, had an ongoing feud with Ms. Reed at the time of the incident. Mr. Lewis was on a date with Latoya McKinley on the night of the incident. After the date, Mr. Lewis went to the store and to a "[c]ouple [of] friends' house[s]." He and his brother were arrested that night as potential suspects in the incident but later released.

[5] Ms. Kelly also described the gun, though her trial testimony about who possessed which gun was somewhat inconsistent. At first, Ms. Kelly denied that Mr. Holmes was in possession of a weapon when she saw him. However, after reviewing her statement to police during which she claimed both men possessed weapons, she testified that both men had guns. On cross-examination, she testified that Mr. Holmes actually possessed the "cowboy" gun.

- 4 -

Holmes his gun to take to Mr. Holmes's brother, Leroy Safari Collins. The gun was a "green .22 caliber automatic." At the time, Mr. Smith was accompanied by his "homeboy Boom."[6] Mr. Smith saw Mr. Holmes walk off "like he was going to meet his brother." After giving Mr. Holmes the gun, Mr. Smith and Boom went to Tops Barbeque to pick up a friend. When Mr. Smith "rolled back through" on Shasta Street later that night, he saw a lot of police but claimed that he did not know about the shooting at that time.

Once Defendant and Mr. Holmes had the guns, Mr. Holmes testified that they "walked on [over to] Shasta" Street. It was about a ten to fifteen minute walk. Mr. Holmes described that there were "a whole lot of people out there" standing by a tree. Mr. Holmes and Defendant "put the shirts [they were wearing] over [their] face[s]" and pulled out their guns as they walked toward the people. Defendant told everyone to "get down." The people looked "shocked." Mr. Holmes stated that Defendant fired the first shot. Mr. Holmes was standing in the middle of the street and Defendant was standing to the side of the people, "[a]bout five feet away from them" while he was shooting. Mr. Holmes shot the .22 caliber pistol three times and heard "[a]bout seven or eight" shots total. He did not know who or what he hit with his shots. After the shooting stopped, Defendant and Mr. Holmes left Shasta Street and walked back to Meagher Street. Mr. Holmes was "[s]cared." The men went to the house of Mr. Holmes's cousin, Star, where Mr. Holmes got into an argument with his brother. Mr. Holmes called his grandmother and sister, who came to pick him up "[a]bout twenty minutes" later.

Mr. Smith saw both Mr. Holmes and Defendant after the incident. Mr. Holmes was getting into the car of his grandmother, Odessa Holmes. About two days later, Mr. Smith and Ms. Kelly saw both Mr. Holmes and Defendant at a "foreclosed apartment." According to Mr. Smith, Defendant was "still staying there," using the apartment as a place to "just go to and kick it." Mr. Smith overheard Defendant tell Ms. Kelly that "he shot [the victim], that's all, because he was trying to protect [Mr. Holmes]" because the victim had a gun. Ms. Kelly agreed that Defendant told her that the robbery went bad and that he "shot the bitch" because he thought that the victim was going to shoot him. Defendant thought that the victim had a gun in her pocket, but it turned out to be an MP3 player. Ms. Kelly explained that she and Defendant were members of the Gangster Disciples gang at the time, so "he was more lenient in[] telling [her] what happened."

Leroy Safari Collins, Mr. Holmes' brother, recalled a conversation on July 19 between Defendant, Mr. Holmes, and Mr. Smith about a potential robbery of someone who had just gotten a "refund check." After the conversation, Mr. Collins left with his girlfriend. The next time he saw Defendant, Defendant told Mr. Collins that he "killed

---

[6] "Boom's" real name does not appear in the record.

somebody" because she "had a gun" and was "going to kill" Mr. Holmes. Mr. Collins understood this to mean that Defendant and Mr. Holmes "went through with the plan." Defendant told Mr. Collins he used a .38 caliber revolver and Mr. Holmes used a .22 caliber pistol. The guns were described as "hood guns," guns that were hidden in a "cut" in a house that "anybody had access to." Mr. Collins explained that if you "hung out" with them,[7] you could use the guns. Several days after the incident, Defendant again told Mr. Collins that he "killed that bitch."

Mr. Holmes left Memphis and went to St. Louis the morning after the incident. He stayed in St. Louis for a month before his "granddaddy" came to get him to "go talk to the police." Mr. Holmes admitted that he did not call the police after the incident. In fact, when he first talked to police, he initially denied involvement and then claimed that he was only a lookout before finally disclosing the true events to the police.

Luther Dewayne Street testified that he had been incarcerated in the same cell as Defendant prior to trial.[8] Mr. Street recalled a conversation during which Defendant told him that he and Mr. Holmes "were planning on going and rob this dude named Travis and that they did rob him and he got shot." Defendant told Mr. Street that "he shot Travis and the other dude shot the girl but the family was trying to pin it off on him." Mr. Street testified that Defendant said he used the .22 caliber pistol during the incident.

Defendant testified at trial. He denied that he was a gang member and denied planning a robbery. In fact, Defendant denied going anywhere with Mr. Holmes or telling anyone that he killed the victim. Defendant admitted that he knew Mr. Holmes "through the neighborhood" and was familiar with his brother, Mr. Collins, as well as Mr. Smith. Defendant claimed that he did not recall his whereabouts on the night of the incident. Defendant recalled sharing a cell with Mr. Street but claimed it was when he was in "the hole" or administrative segregation.

In rebuttal, the State called Officer Keeley Gray, of the Shelby County Sheriff's Office Jail Division Gang Unit. As part of her job, she interviewed inmates to determine their criminal gang affiliation. The Gang Unit keeps a tag system whereby inmates are identified by their criminal gang affiliation. She testified that Defendant admitted during

---

[7] When Mr. Collins explained that the guns were for use by anyone who hung out with "them," it is not clear if he meant people that lived in the neighborhood or people who were members of a particular gang.

[8] Mr. Street was incarcerated at the time of trial but testified that he did not receive any special treatment as a result of his testimony. Moreover, Mr. Street admitted on cross-examination that he had multiple arrests and convictions, including criminal impersonation, theft of property, and aggravated burglary.

his Gang Unit interview that he was a member of the Gangster Disciples and that he had gang tattoos. Officer Gray testified that Defendant had been written up in jail for throwing gang signs.

At the conclusion of the proof, Defendant was convicted as charged in the indictment, including first degree felony murder, first degree premeditated murder, attempted first degree murder, two counts of attempted especially aggravated robbery, and one count of employing a firearm during the commission of a felony. The trial court merged the first degree premeditated murder conviction with the conviction for first degree felony murder. Defendant was sentenced to nine years for each conviction of attempted especially aggravated robbery, six years for employing a firearm during the commission of a felony and twenty-two years for attempted first degree murder. These sentences were ordered to run concurrently with each other but consecutively to the life sentence for the first degree felony murder conviction for an effective sentence of life plus twenty-two years.

*Analysis*

On appeal, Defendant argues that there is no evidence that he "intentionally engaged in an action or intended to commit robbery" or committed premeditated murder. He argues that the only proof against him at trial came from friends and relatives of Mr. Holmes or Mr. Holmes himself and that Mr. Holmes was the only person that "positively identified [Defendant] at the scene of the crime." In other words, Mr. Holmes's testimony was not corroborated, and Defendant's identity was not proven. Defendant also argues that there was no proof that a robbery occurred. The State, on the other hand, points to the overwhelming evidence against Defendant.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the

witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any" robbery. T.C.A. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103.

> "Knowing" means that a person acted knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

T.C.A. § 39-11-106(a)(20). A person acts '"intentionally"' with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result. T.C.A. § 39-11-302(a). To convict for especially aggravated robbery, the State had to prove that the defendant robbed the victim with a deadly weapon and that the victim suffered serious bodily injury. *Id.* § 39-13-403(a). Serious bodily injury is defined as bodily injury that involves a substantial risk of death. T.C.A. § 39-11-106(a)(34)(A). A person commits criminal attempt when he or she acts with intent to complete a course of action that would constitute the offense, and the conduct constitutes a substantial step toward the commission of the offense. T.C.A. § 39-12-101(a)(3).

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State,

and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *see State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Keeping the elements of the convictions for which Defendant was found guilty in mind, we note "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696-97 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). An accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014). Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, the longstanding rule has been that only slight corroboration is required. *See Hawkins v. State*, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963). Corroboration of an accomplice's testimony cannot come from the testimony of another accomplice. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001) (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)).

To the extent Defendant challenges the State's proof of his identity, we acknowledge that "[t]he identity of the perpetrator is an essential element of any crime." *State v. Robert Wayne Pryor*, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)), *no perm. app. filed*. The State has the burden of proving "the identity of the

defendant as the perpetrator beyond a reasonable doubt." *Id.* (citing *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *Strickland*, 885 S.W.2d at 87 (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Looking at the evidence presented at trial in a light most favorable to the State, the testimony of Mr. Smith, Mr. Collins, Mr. Street, Ms. Kelly, and Mr. Holmes indicated that Defendant and Mr. Holmes discussed their plans to rob someone on Shasta Street who had a large sum of money. Mr. Smith testified that he was approached by Defendant and Mr. Holmes to participate in the robbery. Mr. Smith thought the men were joking but gave Mr. Holmes a gun shortly before the shooting, supposedly so that he could give the gun to Mr. Collins. Mr. Holmes testified that he and Defendant ran across a "cut" to Shasta Street and got close to an area where several people, including the victims, were gathered. Defendant started shooting because he thought that one of the women had a gun. Mr. Holmes fired several shots as well. Mr. Holmes was not sure who he hit with his shots. Mr. Smith, Ms. Kelly, and Mr. Collins all testified that Defendant admitted that he "shot the bitch" after the incident took place. Defendant denied any and all involvement.

The testimony of Mr. Holmes and Mr. Smith, while not corroborated with regard to each and every event, was corroborated by the testimony of the other people present both at the scene of the incident and in the events leading up to the incident enough to "lead[] to the inference, not only that a crime has been committed, but also that the defendant is implicated in it." *Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803). At trial, the testimony of Ms. Beal, Ms. Reed, and Mr. Metcalf is consistent with Mr. Holmes's account of what transpired at the time of the shooting. Moreover, several of the witnesses at the scene described the shooters, whose physical description matched that of Defendant and Mr. Holmes. Defendant told several people after the incident, including Ms. Kelly, that he shot and killed the victim. The evidence presented at trial established that Defendant and Mr. Holmes were both armed when they encountered the group on Shasta Street, and both men fired at the victims. There was proof that Defendant used a .38 caliber revolver, and the bullet recovered from the head of the victim was consistent with being shot through a .38 caliber and could not have been fired through a .22 caliber. The jury obviously accredited the testimony of the witnesses for the State that Defendant had possession of a .38 caliber revolver, opened fire on an unarmed victim, and had tried to conceal his identity by covering his face. While it is not clear from the record which of the men shot Mr. Metcalf, it is clear shots were fired from both the .38 caliber revolver possessed by Defendant and the .22 caliber pistol possessed by Mr. Holmes and that one of them hit Mr. Metcalf. After the shooting, Defendant and

Mr. Holmes left together and went to a foreclosed apartment where Defendant was staying. Additionally, there was testimony at trial that prior to the incident, both Defendant and Mr. Holmes discussed the robbery of a person who had just received a large refund check. While the proof indicated that no one was actually robbed during the incident, Mr. Metcalf testified that he was told to "drop it off," something that he understood to indicate that he was being robbed. Ms. Reed thought that she was in the middle of a "robbery," and several of the witnesses at the scene testified that the men told them to "get down" before shooting at them with two different guns.

We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to support the convictions for felony murder and attempted especially aggravated robbery. The proof is also sufficient to support the conviction of attempted first degree murder and employing a firearm during the commission of a dangerous felony as the proof established that Defendant knowingly and voluntarily shared in the criminal intent of attempted first degree murder and assisted in the commission of the offense as either a principle or upon a theory of criminal responsibility. Further, the evidence is sufficient to prove that Defendant employed a firearm during the commission of attempted first degree murder. T.C.A. § 39-17-1324(i)(1)(A).

*Conclusion*

After our review, we determine that the evidence is sufficient to support the convictions. However, during our review of the record, we discovered that the judgment form for Count 2, first degree premeditated murder, indicates that the conviction merges with Count 1, first degree felony murder. However, there is no judgment form for Count 1 in the record on appeal. On remand, the trial court should enter a judgment form for Count 1, first degree felony murder. *See State v. Davidson*, 509 S.W.3d 156, 217 (Tenn. 2016). In all other respects, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE